FILED

02/03/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 20, 2019 Session

## STATE OF TENNESSEE v. DERRICK JEROME MILLER

**Appeal from the Criminal Court for Putnam County**
**No. 2016-CR-928    Gary McKenzie, Judge**

_____

### No. M2019-00214-CCA-R3-CD

_____

The defendant, Derrick Jerome Miller, appeals his Putnam County Criminal Court jury conviction of reckless endangerment, arguing that the trial court erred by admitting into evidence a certain document, that the evidence was insufficient to support his conviction, and that the trial court erred by denying him probation.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Craig P. Fickling (on appeal), Allison R. West (at trial and on appeal), and Benjamin Marsee (at trial), Assistant District Public Defenders, for appellant, Derrick Jerome Miller.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In December of 2016, the Putnam County Grand Jury charged the defendant with one count of reckless endangerment with a deadly weapon.[1]

At the November 2017 trial, Tennessee Highway Patrol ("THP") Trooper Darryl Winningham testified that he had been trained to conduct Level 1 vehicle

_____

[1]    The trial transcript indicates that the State dismissed a second charge of failure to maintain certain braking devices on a trailer under Tennessee Code Annotated section 55-9-204(c)(1); however, the indictment in the record contains only the single count of reckless endangerment with a deadly weapon.

inspections, qualifying him "to inspect trucks, trailers, brakes, brake chambers, break-away devices, rims, tires, everything about a vehicle." He explained that "Level 1 is a complete and full inspection," whereas a Level 3 inspection is "just paperwork which checks your log books, your shipping papers, and all of your documents." Trooper Winningham explained that a THP trooper must attend school to become a Level 1 inspector. Trooper Winningham estimated that he had conducted hundreds of Level 1 inspections in his career.

Trooper Winningham acknowledged that he was not a mechanic but stated that he had been trained to inspect vehicles to determine whether a commercial vehicle was safe to be on the road. In his inspections, Trooper Winningham used a Federal Motor Carrier Safety Administration book to determine whether the vehicle met the criteria to render it "out of service." Trooper Winningham explained that a vehicle inspection could take from 30 to 90 minutes or more depending on the "[d]efficiency issues that you have." He acknowledged that weight requirements of commercial vehicles can change and asserted that he kept up to date on the current requirements.

Trooper Winningham explained that, when a vehicle is pulling a trailer, the trailer should have brakes separate from the vehicle's brakes and that the towing vehicle should be equipped with "a brake box." When the brake box is properly functioning, a driver's depressing the brake pedal in the vehicle should automatically apply the trailer's brakes. Trooper Winningham stated that trailers were also designed with a break-away device, which he described as a safety feature that should automatically deploy the trailer's brakes in the event that the trailer becomes detached from the vehicle.

Trooper Winningham testified that, when inspecting a trailer's brakes, he would allow the driver to "adjust their brake box the way they want it," then, with the vehicle rolling forward slowly, the driver would manually apply the brake box, which action should bring the vehicle and trailer to a stop without the use of the vehicle's brake pedal. To test a break-away device, Trooper Winningham would have the driver manually pull the break-away device out and pull the vehicle forward. When properly functioning, the "trailer brakes will stop" the trailer after a few feet of movement. Trooper Winningham stated that, during an inspection, the driver is permitted to use the vehicle's foot brake only if the brake box does not work properly.

On June 30, 2016, Trooper Winningham was working at the Knox County Scales on Interstate 40 ("I-40") westbound conducting inspections. He conducted a Level 1 inspection of the defendant's 2015 Dodge pickup truck and car hauler trailer loaded with vehicles, which Trooper Winningham estimated to weigh between 25,000 and 30,000 pounds. When conducting the brake box inspection, the defendant's vehicle

and trailer did not slow down or stop as it should have when the defendant manually applied the brake box. Trooper Winningham determined from the inspection that the defendant's brake box was inoperable. Similarly, during Trooper Winningham's inspection of the defendant's break-away device, the trailer did not slow down or stop, leading Trooper Winningham to determine that that device was also defective. Trooper Winningham stated that the brake box and the break-away device are required and that it was unsafe for a vehicle and trailer without these features to be on the road, explaining that, without these functions, "if you apply the truck brake when you're driving down the roadway, your trailer is not going to assist you any." He acknowledged that a driver would be able to stop the vehicle "eventually," but it would take longer to bring the vehicle to a stop.

Trooper Winningham informed the defendant that his brake box and break-away device were not functioning properly, and Trooper Winningham "placed [the defendant] out of service until the repairs were made." He wrote a report that detailed the findings of his inspection and contained the statement, "Vehicle out of service until all out of service items are repaired." The defendant signed a copy of the report, which included the defendant's U.S. Department of Transportation number, 2891016, and a section for the certification to be completed by a repairman after the necessary repairs were completed. Trooper Winningham said that he provided the defendant with a verbal explanation of the results of the inspection and the requirement for a repairman to certify the repairs. After concluding the inspection, Trooper Winningham returned to the scale house and saw the defendant walk around his truck and trailer, "pull up and back up once or twice, and then was gone" less than 30 minutes after the inspection was completed. Trooper Winningham stated that he did not see a repairman at the defendant's vehicle. Trooper Winningham notified THP Trooper Craig Wilkerson in the Cookeville district that the defendant had left the Knox County Scales heading west on I-40. Trooper Winningham acknowledged that there were several counties between Knox and Putnam, but he did not notify any troopers in those counties. He stated that he contacted Trooper Wilkerson because he was "somebody I knew."

During cross-examination, Trooper Winningham stated that, during his Level 1 certification training, he learned how tractor trailer and truck brake systems "work, what to look for, how to check the adjustments, how to tell if they're properly adjusted, check for leaks around [the] brake drums, and all of that." He was also trained on the necessary safety equipment of certain vehicles. Trooper Winningham explained that when he conducted an inspection, he would print two copies of the inspection report – one to give to the driver and one to keep in his file. He stated that copies of the reports that were printed from the Aspen system should be identical to the reports that he prints during the inspection, but he acknowledged that a copy of the defendant's report printed

from the Aspen system included the phrase "Query Central 3.4" which was not included on the copy of the report that he printed at the time of the inspection. He also acknowledged that one report had the name of a passenger in the defendant's vehicle while the other did not. Similarly, one report had the words "Out of Service" where the other report had the abbreviation "OOS." Trooper Winningham could not say whether the defendant had received a copy of the report with the words "Out of Service."

Trooper Winningham described the defendant's vehicle as a Dodge pickup truck with a flatbed with a trailer attached to the flatbed. A brake box was attached to the dash inside the cab of the truck with an electric connection from the brake box to the trailer brakes through a connector that plugged into the side of the trailer. Trooper Winningham agreed that a malfunction in the electrical connection would render the trailer brakes inoperable and that such a malfunction could occur by the connector becoming unplugged, corroded, or dirty. Trooper Winningham explained that the electrical connection could be restored "[i]f you clean [the connector] up and do it the way it's supposed to."

Trooper Winningham stated that the law required trailers engaged in interstate commerce to be equipped with functioning brakes. He agreed that farming trailers could also be big and heavy but that farm trailers were not required to have brakes unless they were driven over a certain speed. Trooper Winningham acknowledged that, under Code section 55-9-204, a farming trailer carrying the same amount of weight as a commercial trailer did not have to be equipped with the same brakes. He agreed that, "[t]o a point," not every heavy trailer was required to have operational brakes, noting that trailers used in farming operations are exempted from the requirement "[u]nless they go beyond the hour miles." Trooper Winningham stated that he had never arrested someone for reckless endangerment for driving a farming trailer without trailer brakes.

THP Trooper Martin Mahan testified that on June 30, 2016, he was driving westbound on I-40 in Putnam County where traffic was "[h]eavy." Trooper Mahan had been alerted to keep a look out for the defendant's vehicle, which he described as a "dually truck pulling a . . . car hauler with five cars," and when he saw the defendant, he effectuated a traffic stop, which was captured by the video recording equipment attached to Trooper Mahan's vehicle. He explained that there was an audio recording device inside the vehicle as well as on his belt but said that the audio was difficult to hear on the recording because it was recorded from the side of the interstate. Trooper Mahan stated that the defendant was "slow to stop" after Trooper Mahan activated his emergency lights, and, after the defendant stopped, Trooper Mahan instructed him to move his vehicle "past the guardrail" on the side of the road.

-4-

Trooper Mahan said that he was qualified to do Level 3 inspections, which included "check[ing] the driver's log books and paperwork." Although, Trooper Mahan was not qualified to do brake inspections, Trooper Wilkerson, a certified Level 1 inspector, arrived on the scene shortly after the defendant was stopped. From the side of the interstate, Trooper Mahan instructed the defendant to drive to a truck stop at exit 288 for a brake inspection. Troopers Mahan and Wilkerson followed the defendant to the truck stop where the defendant acknowledged that he knew he had been placed out of service but said that he thought he had fixed the problem. Trooper Mahan stated that the amount of traffic seen on I-40 on the video was typical for that time of day.

During cross-examination, Trooper Mahan stated that the defendant was placing other motorists in imminent danger of death or serious bodily injury while driving on I-40. Trooper Mahan first stated that he followed the defendant for approximately one-fourth of a mile before activating his blue lights, but when pressed, Trooper Mahan acknowledged that he followed the defendant approximately three miles, before activating his emergency lights despite his knowing that the defendant had been placed out of service for brake issues. He also acknowledged that he instructed the defendant to drive another mile down the interstate to a truck stop despite the danger posed by the defendant's trailer. Trooper Mahan maintained that every person that the defendant passed on the road was in imminent danger despite his allowing the defendant to continue for three miles before stopping him. Trooper Mahan acknowledged that the defendant drove within the speed limit, maintained his lane of travel, and did not otherwise drive unsafely and that the defendant was able to stop his vehicle despite the defective trailer brakes.

On redirect examination, Trooper Mahan stated that Putnam County abuts Cumberland County at mile marker 304 on I-40. He acknowledged that by the time the defendant was stopped at mile marker 290, he had been driving in Putnam County for 14 miles.

THP Trooper Craig Wilkerson, who was certified to conduct Level 1 inspections, testified that, on June 30, 2016, Trooper Winningham notified him that the defendant had left the Knox County Scales after failing a brake inspection. Trooper Wilkerson arrived on the scene shortly after Trooper Mahan had stopped the defendant on I-40. Because Trooper Wilkerson knew of the defendant's brake deficiencies, he had the defendant proceed to a truck stop in order to inspect his brakes. During the inspection, the defendant's manual application of the brake box failed to slow or stop the vehicle. After allowing the defendant to retry the test more than once, Trooper Wilkerson determined that the defendant's trailer's "electric brakes [we]re inoperable." Trooper Wilkerson also tested the defendant's break-away device, which also failed to operate

-5-

correctly.

Trooper Wilkerson explained that a repairman was supposed to sign the inspection report after completing the necessary repairs. Although the defendant told Trooper Wilkerson that he thought he had fixed the brake issues himself, the defendant did not sign the repairman certification portion of the report. Trooper Wilkerson stated that I-40 Tires, Inc. Truck and Trailer Repair ("I-40 Tires") was located "directly behind the truck stop" where he had inspected the defendant's brakes. Trooper Wilkerson reviewed an invoice from I-40 Tires dated July 1, 2016, which invoice included the defendant's name and U.S. Department of Transportation number. The invoice also included a hand-written list of invoiced services with corresponding prices[2] and the number "6" in a column labeled "Quan." next to the word "LABOR."

During cross-examination, Trooper Wilkerson testified that he followed the defendant for approximately two miles behind Trooper Mahan before Trooper Mahan effectuated a traffic stop, and Trooper Wilkerson did not observe any unsafe driving by the defendant. He acknowledged that the video recording showed the defendant safely stopping his vehicle five times, including at least once while on a downgrade. Trooper Wilkerson estimated that he allowed the defendant to attempt the manual brake test at least three times, and each time, the defendant had to use the vehicle's foot brake to stop the vehicle and trailer.

On redirect examination, Trooper Wilkerson posited that "[i]t would take a lot longer" to stop the vehicle quickly without functioning trailer brakes "based on the speed the vehicle is traveling and the efficiency of the actual brakes themselves."

On recross-examination, Trooper Wilkerson acknowledged that the defendant was traveling at "interstate speeds" when Trooper Mahan effectuated the traffic stop and that the defendant was able to bring his vehicle to a stop at that time. On further redirect examination, Trooper Wilkerson said that, at no point during the encounter captured by the video recording, did the defendant have to stop his vehicle

---

[2]     The hand-written list of invoiced services is listed below:

| QUAN. | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| 6 | Grease Seal | 4.75 | 28.44 |
| 3 | LH Ele Brake Assembly | 69.68 | 209.04 |
| 3 | RH Ele Brake Assembly | 69.68 | 209.04 |
| 12 | Brake Clean | | 78.76 |
| | Parts Run | | 25.00 |

quickly. During further recross-examination, Trooper Wilkerson acknowledged that no vehicle carrying the weight of the defendant's load could "[s]top on a dime" even with fully functioning brakes.

On this evidence, the jury found the defendant guilty of the lesser included offense of reckless endangerment and fixed a fine of $2,500. After a sentencing hearing, the trial court imposed a sentence of 120 days' incarceration of which the defendant must serve 75 percent before becoming eligible for work release, furlough, trusty status, or rehabilitative programs. Following a timely but unsuccessful motion for a new trial, the defendant filed this timely appeal and argues that the evidence at trial was insufficient to support his conviction, that the trial court erred by admitting the I-40 Tires invoice into evidence, and that the trial court erred by denying him probation.

*I. Sufficiency of the Evidence*

The defendant contends that the State failed to present sufficient evidence to support his conviction of reckless endangerment and that the trial court erred by denying his motion for judgment of acquittal. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (superseded on other grounds); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

As relevant to this case, "[a] person commits an offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a). "[A] person acts recklessly . . . when

-7-

the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur" and when the risk is "of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." *Id.* § 39-11-106(a)(31). The danger of death or serious bodily injury is imminent when a person is "placed in a reasonable probability of danger as opposed to a mere possibility of danger." *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999) (citing *State v. Fox*, 947 S.W.2d 865, 866 (Tenn. Crim. App. 1996)). The person placed in imminent danger may be a "class of persons occupying [a] 'zone of danger.'" *Payne*, 7 S.W.3d at 28.

Here, the State's evidence established that the defendant was driving a truck and pulling a car hauler trailer loaded with 5 cars, which Trooper Winningham estimated to weigh 25,000 to 30,000 pounds. The defendant's brake box and break-away device were deemed inoperable during an inspection at the Knoxville scales, and Trooper Winningham told the defendant that his vehicle was "out of service" until repairs to these items were made and certified by a repairman. Trooper Winningham also gave the defendant an inspection report with that same information. Despite being told his vehicle was out of service, the defendant proceeded to drive westbound on I-40 at "interstate speeds" until he was stopped by Trooper Mahan in Putnam County. During a second inspection by Trooper Wilkerson, the defendant's brake box and break-away device were again determined to be inoperable. Trooper Winningham testified that a functioning brake box and break-away device were required by law, and both Troopers Winningham and Wilkerson testified that the defendant's driving his vehicle and trailer without functioning trailer brakes was unsafe because it would be more difficult for the defendant to stop his vehicle. Trooper Mahan testified that there was heavy traffic on I-40 at the time, and the jury saw a video recording of the defendant's driving on I-40 when other vehicles were present on the road.

Although a violation of Code section 55-9-204 is not per se reckless endangerment, under these facts, a rational trier of fact could have found beyond a reasonable doubt that the defendant recklessly drove a vehicle pulling a trailer that lacked the required brakes, placing other persons in a reasonable probability of danger of death or serious bodily injury.

Accordingly, we hold that sufficient evidence exists to support the defendant's conviction for misdemeanor reckless endangerment.

*II. Admission of Repair Invoice*

-8-

The defendant contends that the trial court erred by admitting into evidence a repair invoice from I-40 Tires, arguing that the State failed to comply with the notice requirement of evidence rule 902(11), that the invoice was admitted in violation of evidence rule 407, and that the invoice and its accompanying affidavit violated the hearsay rules and deprived him of his right to confrontation.

Both the rules of evidence and the common law designate the trial court as the "arbiter of authentication issues," and, accordingly, that court's ruling will not be disturbed absent a showing that the court clearly abused its discretion. *See* Tenn. R. Evid. 901, Advisory Comm'n Comments; *State v. Mickens*, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003). Similarly, an appellate court reviews the "trial court's decision to admit or exclude evidence under Tennessee Rule of Evidence 407 under an abuse of discretion standard." *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 87 (Tenn. 2008) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)), *overruled on other grounds by State v. Patterson*, 564 S.W.3d 423, 433-34 (Tenn. 2018); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

*A. Rule 902(11)*

The defendant first argues that the State failed to give notice of its intent to offer the invoice as evidence as required by evidence rule 902(11).

Evidence rule 901(a) requires that evidence be authenticated or identified as a condition precedent to its admissibility. Tenn. R. Evid. 901(a). Generally, authentication of tangible evidence requires the testimony of a witness, *see State v. Kilpatrick*, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000); however, the rules provide for the self-authentication of certain documents. As relevant here, evidence rule 902(11) provides:

> Extrinsic evidence of authenticity as a condition precedent to admissibility is not required as to . . . [t]he original or a duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by an affidavit of its custodian or other qualified person certifying that the record:

(A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of and a business duty to record or transmit those matters;

(B) was kept in the course of the regularly conducted activity; and

(C) was made by the regularly conducted activity as a regular practice.

Tenn. R. Evid. 902(11). To admit a record into evidence under this Rule, "[a] party . . . must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them." *Id.*

Here, the trial court ruled that the State provided adequate notice by emailing defense counsel a copy of the invoice and affidavit. The purpose of the notice requirement is to provide the opposing party adequate time to challenge the evidence. *See* Tenn. R. Evid. 902(11); *Regions Bank, N.A. v. Williams*, No. W2013-00408-COA-R3-CV, slip op. at 7 (Tenn. Ct. App., Jackson, Feb. 12, 2014). The defendant acknowledged receipt of the emailed invoice and affidavit and conceded that he could have inferred that the State intended to offer the invoice as evidence. In this case, the purpose of the notice requirement was not frustrated because the defendant understood the State's intent to offer the invoice as a self-authenticating record. The record supports the trial court's ruling, and the trial court did not abuse its discretion in admitting the invoice.

### B. Rule 407

Next, the defendant challenges the evidentiary relevance of the invoice, arguing that the invoice was evidence of a subsequent remedial measure and was admitted in violation of evidence rule 407.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

Relevant evidence may also be inadmissible under evidence rule 407, which provides:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent remedial measures is not admissible to prove strict liability, negligence, or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving controverted ownership, control, or feasibility of precautionary measures, or impeachment.

Tenn. R. Evid. 407. "The purpose of this evidentiary rule is to 'encourage remedial measures in order to serve the public's interest in a safe environment.'" *Martin*, 271 S.W.3d at 87 (Tenn. 2008) (quoting NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.07[2] (5th ed. 2005)).

We disagree with the trial court that Rule 407 is inapplicable in criminal cases. The policy underlying Rule 407 applies equally in criminal cases as in civil cases. The public's interest is served by encouraging both the civil defendant and the criminal defendant to remedy an unsafe environment. Furthermore, nothing in the rule excludes its application in the criminal context. *See* Tenn. R. Evid. 101 ("These rules shall govern evidence rulings in all trial courts in Tennessee except as otherwise provided by statute or rules of the Supreme Court of Tennessee."). Rule 407 does not operate to exclude evidence of subsequent remedial measures that were mandated by a statute designed to alleviate the danger posed by the unsafe condition because, in that instance, exclusion of the evidence is not necessary to encourage the defendant to remedy the dangerous condition. *See Martin*, 271 S.W.3d at 88.

Relevant to this case, Code section 55-9-204(c)(1) provides:

> Every trailer or semitrailer of a gross weight of three thousand pounds (3,000 lbs.) or more when operated upon a highway shall be equipped with brakes adequate to control the movement of and to stop and to hold the vehicle and so designed as to be applied by the driver of the towing motor

vehicle from its cab, and the brakes shall be so designed and connected that in case of an accidental breakaway of the towed vehicle, the brakes shall be automatically applied.

T.C.A. § 55-9-204(c)(1). Furthermore, "[a] violation of this section is a Class C misdemeanor." We conclude that this statute alone is sufficient to encourage a defendant to remedy any danger posed by inadequate trailer brakes, and therefore, the application of Rule 407 was unnecessary.

That being said, we can see no fact of consequence to which the repair invoice is relevant. The invoice provides the defendant's name, address, vehicle information, and charges for certain services and six units of labor. Although Trooper Wilkerson testified that the invoice bore the defendant's name and U.S. Department of Transportation number, the defendant's identity and control of the vehicle were not in question. *See Thomson v. Thompson*, 749 S.W.2d 468, 471 (Tenn. Ct. App. 1988) ("[E]vidence of subsequent remedial measures becomes relevant only when the defendant has raised the issue of control and ownership." (citing E. CLEARY, MCCORMICK'S HANDBOOK ON THE LAW OF EVIDENCE § 275, at 817 (3d ed. 1984)). The State argued that it offered the invoice to show that the necessary repairs to the defendant's brakes required six hours of labor; however, the invoice shows only the hand-written number "6" next to the word "Labor" but does not indicate what unit of measurement was used to calculate the labor. The invoice also indicates that several services were provided but does not indicate how many units of labor corresponded to each service. Furthermore, the State offered no evidence that the services listed on the invoice related to the repair of the defective trailer brakes. Although the invoice seems to indicate services for brake assembly and cleaning, it does not specify whether those services related to the defendant's brake box and break-away device or whether those services repaired the specific issues that caused the defendant's vehicle and trailer to be placed out of service. Consequently, the invoice did not make any fact of consequence more or less probable and was, therefore, inadmissible. *See* Tenn. R. Evid. 402.

Although the trial court erred by admitting the invoice from I-40 Tires into evidence, we conclude that the error was harmless in light of the other evidence against the defendant. Troopers Winningham and Wilkerson each inspected the defendant's brake box and break-away device, and each deemed the trailer's brakes to be inoperable. The defendant drove the 25,000- to 30,000-pound trailer on I-40 at "interstate speeds" without the required brakes while other motorists were also on the road. It is not likely that the jury would have reached a different verdict if the I-40 Tires invoice had been properly excluded. *See State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) ("Where an error is not of a constitutional variety, Tennessee law places the burden on the

defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" (quoting Tenn. R. App. 36(b); *State v. Ely*, 48 S.W.3d 710, 725 (Tenn. 2001); *State v. Harris*, 989 S.W.2d 307, 315 (Tenn. 1999))).

## C. Hearsay

Finally, the defendant contends that the invoice and accompanying affidavit violate the hearsay rule. Specifically, the defendant argues that he was deprived of his opportunity to confront Ms. Ward, and thus, her affidavit was inadmissible.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. As relevant here, Rule 803(6) excludes from the hearsay rule certain records of regularly conducted activity:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Tenn. R. Evid. 803(6).

Our supreme court has confirmed that "[t]he standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next

questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule—are questions of law subject to de novo review." *Kendrick*, 454 S.W.3d at 479 (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)); *see also Gilley*, 297 S.W.3d at 760 (stating that because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law"). "If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement." *Kendrick*, 454 S.W.3d at 479; *see also Gilley*, 297 S.W.3d at 760-61.

Relatedly, the Sixth Amendment to the federal constitution and article I, section 9 of the Tennessee Constitution afford the criminal accused the right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Although the provisions are not coterminous, our supreme court has "expressly adopted and applied the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment." *State v. Dotson*, 450 S.W.3d 1, 62 (Tenn. 2014) (citing *State v. Parker*, 350 S.W.3d 883, 898 (Tenn. 2011); *State v. Franklin*, 308 S.W.3d 799, 809-10 (Tenn. 2010); *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008); *State v. Lewis*, 235 S.W.3d 136, 145 (Tenn. 2007)). In *Crawford v. Washington*, the United States Supreme Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . ." *Id.* Because the Confrontation Clause does not bar nontestimonial hearsay, *see Davis v. Washington*, 547 U.S. 813, 823-24 (2006); *Whorton v. Bockting*, 549 U.S. 406, 420 (2007), "the threshold question in every case where the Confrontation Clause is relied upon as a bar to the admission of an out-of-court statement is whether the challenged statement is testimonial." *Dotson*, 450 S.W.3d at 63 (citing *Cannon*, 254 S.W.3d at 301).

The *Crawford* court identified, for illustrative purposes, a "core class of 'testimonial' statements": "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51-52 (alteration in original) (citations omitted).

-14-

Similarly, the court observed that some "statements . . . by their nature were not testimonial," including, among other things, "business records." *Id.*; *Dotson*, 450 S.W.3d at 64. Thus, statements that are properly categorized as business records are nontestimonial, and the Confrontation Clause has no application to their admission into evidence. *Cannon*, 254 S.W.3d at 303.

For those statements that are not easily classified as nontestimonial, our supreme court has concluded that "a statement is testimonial at least when it passes the basic evidentiary purpose test plus either the . . . targeted accusation requirement" adopted by the plurality of the Supreme Court in *Williams v. Illinois*, 567 U.S. 50 (2012), or the "formality criterion" espoused by Justice Thomas in his concurring opinion in *Williams*, stating that "[o]therwise put, . . . an out-of-court statement is testimonial . . . if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character." *Dotson*, 450 S.W.3d at 69 (quoting *Young v. United States*, 63 A.3d 1033, 1043-44 (D.C. Cir. 2013)).

A statement is evidentiary when its "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution." *Dotson*, 450 S.W.3d at 64 (quoting *Davis v. Washington*, 547 U.W. 813, 822 (2006)). "When determining a statement's primary purpose, 'the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.'" *Dotson*, 450 S.W.3d at 64 (quoting *Michigan v. Bryant*, 562 U.S. 344, 360 (2011)); *see also Williams*, 567 U.S. at 84 ("We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances." (citing *Bryant*, 562 U.S. at 360)).

Although we acknowledge that other jurisdictions have found that an affidavit that serves solely as the authenticating document for a business record is nontestimonial, *see, e.g., United States v. Yeley-Davis*, 632 F.3d 673, 680 (10th Cir. 2011); *United States v. Adefehinti*, 510 F.3d 319, 328 (D.C. Cir. 2007); *United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006); *State v. Brooks*, 56 A.3d 1245, 1255 (N.H. 2012); *State v. Doss*, 754 N.W.2d 150, 163-64 (Wisc. 2000), we are constrained to follow the test articulated by our supreme court, *see Dotson*, 450 S.W.3d at 69 (quoting *Young v. United States*, 63 A.3d 1033, 1043-44 (D.C. Cir. 2013)).

The first document at issue here is the invoice from I-40 Tires dated July 1, 2016, and issued to the defendant. The invoice itself qualifies as a business record under Rule 803(6) and is, in consequence, excepted from the hearsay rule. Additionally, as a

business record, the invoice was nontestimonial, and its admission did not violate the Confrontation Clause. *See Cannon*, 254 S.W.3d at 303.

The second document at issue is the affidavit of I-40 Tires manager Jennifer Ward, which was submitted to the jury along with the invoice. Ms. Ward's affidavit certified that the invoice was "made at or near the time of occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of and a business duty to record or transmit those matters," "was kept in the course of the regularly conducted activity of" I-40 Tires, and "was made by the regularly conducted activity as a regular practice of" I-40 Tires. Under Rule 902(11), an affidavit of the custodian of a business record "or other qualified person" must accompany the business record for the record to be self-authenticating. Tenn. R. Evid. 902(11).

Rule of Evidence 902(11) does not express that the authenticating affidavit be admitted into evidence with the business record. The affidavit cannot become part of the business record because it does not satisfy the requirements of Rule 803(6), and accordingly, is inadmissible hearsay. *See* Tenn. R. Evid. 803(6). The affidavit is merely a procedural mechanism by which a business record may be authenticated, *see* Tenn. R. Evid. 902(11), and the trial court, not the jury, is tasked with determining the admissibility of evidence, *see* Tenn. R. Evid. 104 ("Preliminary questions concerning the . . . admissibility of evidence shall be determined by the court . . . ."); *see also id.* at 901(a) (describing authentication as "a condition precedent to admissibility"). Thus, the jury has no need of the affidavit.

Although the affidavit here was made for the purposes of criminal prosecution, a reasonable person would have understood the affidavit to be merely describing the circumstances relating to the creating of the invoice and not as proving a past event. *See Dotson*, 450 S.W.3d at 64. Accordingly, the primary purpose of Ms. Ward's affidavit was to authenticate the I-40 Tires invoice as a business record, and, therefore, it was not evidentiary. Because the primary purpose of the affidavit was not evidentiary, the Confrontation Clause has no application to its admission. *Id.* Additionally, because the affidavit was not evidentiary in nature, we need not address the second prong of the *Dotson* analysis, namely, whether the affidavit was "a targeted accusation or sufficiently formal in character." *See id.* at 69.

Admission of the affidavit did not violate the petitioner's right to confrontation, but the affidavit is nonetheless inadmissible hearsay and should not have not have been submitted to the jury. That being said, because the affidavit here was unrelated to any conduct of the defendant and instead referenced only the circumstances

of the invoice, we conclude that the admission of Ms. Ward's affidavit was harmless. *See Rodriguez*, 254 S.W.3d at 372.

Consequently, the defendant has failed to demonstrate that he is entitled to relief on any issue related to the admission of the invoice from I-40 Tires.

### III. Sentencing

At the defendant's April 23, 2018 sentencing hearing, Community Probation Services Officer Joel Colton testified that he had reviewed the defendant's presentence investigation report. Mr. Colton stated that the defendant was scheduled for a sentencing hearing on January 29, 2018, but that day the defendant tested positive for marijuana and cocaine. The defendant admitted his use of marijuana; however, the defendant denied using cocaine. Further testing by Aegis Lab confirmed the defendant's positive test for cocaine.

During cross-examination, Mr. Colton acknowledged that he had difficulty understanding the defendant's prior out-of-state-convictions, but he believed the defendant's convictions were all misdemeanor offenses resulting in fully suspended sentences. Mr. Colton stated that it did not appear from the presentence report that the defendant had any probation violations.

In rendering its decision to impose a 120 day, fully-incarcerative sentence, the trial court considered the presentence report and the statutory mitigating and enhancement factors. The court found no mitigating factors but found the defendant's criminal history, "whether it's four prior misdemeanors or two," constituted an enhancing factor. The court expressed concern about the defendant's positive drug screen, stating, "[H]e's coming in and he's testing positive as he's about to have his sentencing hearing. And it looks like we're just not getting his attention here." Although the defendant had previously completed probation successfully, the court noted that one goal of probation was "to deter the criminal behavior" and that the defendant's continued criminal violations spoke to the failure of his past terms of probation to deter his criminal conduct.

The defendant appeals the trial court's denial of probation, arguing that incarceration was unwarranted because he had only prior misdemeanor offenses and no previous probation violations. The State contends that the trial court did not err.

Misdemeanor sentencing, in contrast to felony sentencing, is covered by Code section 40-35-302, the terms of which afford the trial court considerable flexibility in setting the length and manner of service of the misdemeanor sentence. *See* T.C.A. §

40-35-302. For example, a separate sentencing hearing is not mandatory in misdemeanor cases, and the enhancement and mitigating factors need only be considered when calculating the percentage of the sentence to be served "in actual confinement" prior to "consideration for work release, furlough, trusty status and related rehabilitative programs." *Id.* § 40-35-302; *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998). Although our supreme court has not yet applied the standard of review adopted in *State v. Bise*—abuse of discretion coupled with a presumption of reasonableness—to misdemeanor sentencing decisions, it has stated, "The abuse of discretion standard, accompanied by a presumption of reasonableness, is the appropriate standard of appellate review for all sentencing decisions." *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013); *see also State v. King*, 432 S.W.3d 316, 324-25 (Tenn. 2014) (holding that, because "*Bise* and its progeny establish that the abuse of discretion standard of appellate review accompanied by a presumption of reasonableness applies to all sentencing decisions," the *Bise* standard is the appropriate standard of appellate review for a trial court's sentencing decision to either grant or deny judicial diversion"). Consequently, we join the other panels of this court that have held that the *Bise* standard similarly applies to appellate review of misdemeanor sentencing. *See, e.g.*, *State v. Willard Hampton*, No. W2018-00623-CCA-R3-CD, slip op. at 17-18 (Tenn. Crim. App., Jackson, Mar. 12, 2019).

Because the record establishes that the trial court complied with the requirements of Code section 40-35-302 relative to misdemeanor sentencing, we "apply a presumption of reasonableness" to the sentencing decision in this case. Given the latitude afforded to trial courts in misdemeanor sentencing, the record reflects a basis for requiring confinement in this case. In determining the manner of service of the defendant's sentence, the trial court pointed to the defendant's prior misdemeanor convictions and his positive drug screen. The presentence report and Mr. Colton's testimony support the trial court's findings, and we discern no error in the trial court's decision to order the defendant to serve his sentence in confinement.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE